**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division - Baltimore**

| | |
|---|---|
| Brady Industries of Maryland, LLC, <br>    7055 Lindell Road <br>    Las Vegas, NV 89118 <br><br>       Plaintiff, <br><br> v. <br><br> Donald Gary Tinder <br>    1988 Esther Court <br>    Forest Hill, MD 21050 <br>    Harford County <br><br> The Holt Paper and Chemical Co., Inc., <br>    31375 John Deere Drive <br>    Salisbury, MD 21804 <br>    Wicomico County <br><br>       Defendants. | Case No. 1:25-cv-1376 <br><br><br><br> **COMPLAINT** |

Plaintiff Brady Industries of Maryland, LLC ("Brady" or "Plaintiff"), as and for its Complaint against Defendants Donald Gary Tinder ("Tinder") and The Holt Paper and Chemical Co., Inc. ("Holt Paper") (collectively, "Defendants"), states and alleges as follows:

### <u>PARTIES</u>

1.      Brady Industries of Maryland, LLC is a Nevada limited liability company with its principal place of business located at 7055 Lindell Road, Las Vegas, Nevada 89118.

2.      Tinder is a citizen and resident of Maryland.  Brady employed Tinder in Maryland beginning on or about December 14, 2022, until his voluntary resignation on or about December 20, 2024.

3.      The Holt Paper and Chemical Co., Inc. is a Maryland corporation with its principal place of business located at 31375 John Deere Drive, Salisbury, Maryland 21804.

4.      Upon information and belief, Tinder is now employed by Holt Paper.

5.      Holt Paper is a direct competitor of Brady.

## JURISDICTION AND VENUE

6.      This Court has subject matter federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Brady is bringing claims under the Defend Trade Secrets Act, 28 U.S.C. § 1836, *et seq*.

7.      This Court has supplemental jurisdiction over Brady's additional claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims within the Court's federal jurisdiction that they form part of the same case or controversy.

8.      This Court has personal jurisdiction over Defendants because they reside in and conduct businesses in this District, and they have caused injuries to Plaintiff in this District by their acts and omissions.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants are residents of the State in which this District is located and because a substantial part of the events giving rise to the claims herein occurred in this District.

## FACTUAL BACKGROUND

### Brady's Business

10.     Brady sells and provides a wide range of janitorial, sanitation, foodservice, paper products, and industrial packaging products, supplies, and support to businesses throughout the United States, including in Maryland, including from offices based in Elridge, Maryland, and Baltimore, Maryland.

11.     Without limitation, products sold by Brady include chemicals, cleaning tools and products, dispensers, parts and equipment, floor care products, food, foodservice disposables, foodservice smallware, beverage products, laundry products, liners and receptacles, office supplies, packaging, and safety products.

12.     Without limitation, Brady's customers and clients include restaurants and bars, and a variety of other public and private businesses and organizations.

13.     Brady operates in a highly competitive market with numerous competitors. Brady's business is dependent on its customer, client, and other business relationships, which have been fostered and developed over time through substantial investments of time, money, and effort by Brady and its employees. Brady has succeeded in this competitive market segment by ensuring that its key employees establish goodwill and long-term relationships with customers, clients, and business relations, as well as their key personnel, decision makers, and associates. These relationships are critical to Brady's business and one of the significant sources of its competitive advantage in the marketplace.

14.     Brady also invests a substantial amount of time and money in developing and maintaining its trade secrets and other confidential and proprietary information relating to its business, and business relationships. Brady's trade secret and confidential information includes, but is not limited to, customer and client lists; methods of operation; plans for new business ventures and products; business strategies; business projections; marketing techniques and arrangements; revenue; budgets; margins and projections; names and contact information of customers and prospects; referral source contact information; customer purchase information and history; customer and prospect requirements; pricing policies and quoting procedures; price lists; cost structure; supply sources; the type, quantity, and specifications of products purchased or sold

by or from clients and/or suppliers; Brady-specific employee trainings and educational resources; contracts and agreements between Brady and third-parties; sales projections, internal databases; reports; forms; manuals; and other non-public Company information.

15.     Because of the specialized nature of Brady's business, the trade secret and other confidential and proprietary information it develops and acquires is unknown to the general public or Brady's competitors and is one of the primary sources of Brady's competitive advantage in the industry.  If one of Brady's competitors were given access to Brady's trade secrets and confidential information, it would put that competitor in an unfair competitive advantage.

16.     Brady goes to great lengths to maintain the secrecy of its trade secrets and confidential information.  Brady does not provide access to any of its trade secrets or other confidential information to members of the general public, clients, customers, or other competitors in the industry, or to non-employees.

17.     Additionally, not all Brady employees have access to all categories of Brady's confidential, trade secret, and proprietary information.  Brady maintains applications and databases, with individualized and secured login credentials, that limit employee access based on a need to know and legitimate job duties.

18.     Brady endeavors to protect its customer, client, and other business relationships; its goodwill and long-term relationships; and its confidential, trade secret, and proprietary information, by requiring certain employees to enter into restrictive covenants.

19.     Brady also endeavors to maintain the confidentiality of its trade secrets and other confidential and proprietary information by requiring all employees to agree to Brady's Employee Handbook that, among other things, requires all employees to maintain the confidentiality of Brady's trade secrets and confidential and proprietary information.

4

**Tinder's Employment at Brady**

20.     Brady hired Tinder as a Sales Representative at its location in Baltimore, Maryland, on or about December 14, 2022.

21.     Because of the work Tinder performed for Brady, and because of the confidential nature of the information to which he was provided access, and in exchange for good and valuable consideration, Brady required Tinder to enter into   an Employee Non-Competition, Non-Solicitation and Confidentiality Agreement (the "Agreement") as an express condition of his employment.  A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

22.     Section 2(a) of the Agreement includes a non-competition agreement, stating in relevant part:

> NON-COMPETITION:  Employee agrees that during the Time Period[1] and within the Geographic Area[2], Employee will not directly or indirectly provide consulting service to, own, manage, operate, join, control, participate in, assist, finance the ownership, management, operation or control of, or be connected as a stockholder, partner, employee or otherwise with any Person[3] who in whole or in part competes with Employer's Business.

23.     Section 2(b) of the Agreement includes a customer non-solicitation agreement, stating in relevant part:

> CUSTOMER NON-SOLICIT:  Employee agrees that during the Time Period and within the Geographic Area, Employee shall not, directly or indirectly, in any capacity, attempt to cause any of Employer's Customers[4] to refrain from

---

[1] Defined in the Agreement as twelve (12) months after the date of employment termination for whatever reason, whether voluntarily or involuntarily.

[2] Defined in the Agreement as "100 miles from any of Employer's or any of its parents, subsidiaries, or affiliate's locations…"

[3] Defined in the Agreement as any " (1) natural person (2) firm; (3) partnership; (4) joint venture; (5) corporation; (6) limited liability company; (7) limited partnership; (8) business venture; (9) trust; (10) association; (11) consumer organization; (12) state, local or federal government agency, branch, department or other governmental unit; or (12) any other entity.

[4] Defined in the Agreement as "actual clients of Employer with whom, during his or her employment by Employer, Employee: (i) has provided services or products in connection with or

patronizing Employer in whole or in part, assist any other person in such activity, contact or solicit any of Employer's customers for himself or herself or for any business competitive with Employer and/or to offer any services to any of Employer's Customers which in any manner compete with Employers business.

24.     Section 2(d) of the Agreement includes a confidentiality and nondisclosure

agreement, stating in relevant part:

> CONFIDENTIALITY:  During the Employee's employment, Employee will have access to and become exposed to a substantial amount of Confidential Information…Employee acknowledges and agrees that all Confidential Information: (i) is the sole and exclusive property of Employer; (ii) is a valuable asset, which Employer wishes to keep secret to protect it's legitimate business and proprietary interests; and (iii) is subject to Employer's reasonable efforts to maintain its secrecy and confidentiality.  Accordingly, Employee agrees to the following:
>
> > a.     Non-Use.  During the course of Employee's employment and after Termination, Employee covenants and agrees that Employee will not use the Confidential Information for the benefit Employee or any Person other than Employer, in whole or in part, in any manner either directly or indirectly; Employee shall not, without the prior written consent of Employer, which consent may be withheld in Employer's sole and absolute discretion, use from Employee's own benefit or purposes, any Confidential Information;
> >
> > b.     Non-Disclosure.  During the course of Employee's employment, Employee covenants and agrees that Employee will keep the Confidential Information in the strictest confidence, and share it with Persons only for the benefit of, and with the express authorization of, Employer.  Moreover, from and after Termination, Employee will not disclose any Confidential Information, in whole or in part, in any manner either directly or indirectly, to any Person other than Employer….

25.     Section 3 of the Agreement includes a presumption of employee's wrongful use of

customer lists, stating:

> Employee acknowledges that the employment relationship established during the term of Employee's employment shall permit Employee to have access to Employer's customer lists.  Employee further recognizes that it would be difficult

---

relating to the Business, (ii) has solicited with respect to the provision of services or products in connection with or relating to the Business, or (iii) had supervisorial responsibility for managing during employment.

to determine if Employee, either during the term of his or her employment or subsequent to his or her Termination, has been using Employer's customer lists in a manner contrary to the provision so his or her Agreement. Therefore, Employee STIPULATES that, in any proceedings in which Employee is shown to be contacting, soliciting, engaging in, or receiving business, either directly or indirectly, from Employer's customers in a manner contrary to the provisions of this Agreement, it shall be considered prima facie evidence that the names and addresses of such customers became known to Employee as a result of the confidential relationship between Employer and Employee, and it shall be PRESUMED that Employee has violated the terms of this Agreement, and the burden shall be shifted to and shall be placed on Employee to prove otherwise.

26.     In Section 4 of the Agreement, Tinder agreed that the terms and restraints of the restrictive covenants within the Agreement are reasonable.

27.     Section 5 of the Agreement provides for injunctive relief, stating:

Because violating any of the restraining covenants of this Agreement would cause irreparable damage to Employer by destruction of Employer's good will and patronage, and since the exact amount of such damage would be difficult, if not impossible to ascertain, Employee STIPULATES that Employer shall be entitled to an injunction to restrain Employee or any of Employee's agents from violating any of the covenants contained in this Agreement. Pending decisions on the application for this injunction, Employee STIPULATES that Employer shall be entitled to obtain preliminary and permanent injunctive relief without prejudice to any other remedies available to Employer.

28.     As consideration for signing the Agreement, Brady agreed to employ Tinder full-time and provide him with pay, access to employee benefit plans and programs, access to training, and other benefits and compensation.

29.     Section 1 of the Agreement confirms that Tinder was provided adequate consideration in exchange for entering the Agreement:

Employee acknowledges and agrees that the consideration received from Employer in exchange for execution of this Agreement is reasonably related to the restrictions imposed on the Employee herein. Employee also acknowledges and agrees that the consideration received from Employer in exchange for execution of this Agreement is reasonably related to Employer's interest in protecting its Confidential Information as well as the goodwill between Employer and its employees.

30.     As a result of his employment with Brady, Tinder was provided access to, and relied upon, some of Brady's most protected confidential information and trade secrets, including, but not limited to, Brady's customer and client lists, customer contact information, customer prospects, method of doing business, pricing and cost structure, marketing techniques, purchasing information, quoting procedures, customer and prospect requirements, vendor information, and other confidential financial information.

31.     Throughout his employment, Brady invested substantial efforts and investment into Tinder's development, training, and knowledge in the industry.  The training and other efforts provided to Tinder by Brady is unique and proprietary and represent a legitimate business interest of Brady.

32.     Brady has continuously taken reasonable measures to safeguard and maintain the secrecy of its confidential, trade secret, and other proprietary information, developed at great expense and effort, and it is not shared with any third parties, including competitors such as Holt Paper.

33.      But for his execution of the Agreement, including its restrictive covenants, Tinder would not have been employed by Brady and would not have been provided with access to any of Brady's confidential information and trade secrets nor would he have been provided with Brady's training and other employee development investments.

34.     All of the trade secrets, confidential information, client and customer goodwill, and training that Tinder had access to from Brady is highly valuable and provides Brady with a significant competitive advantage in the marketplace.  If Tinder were allowed to disclose the information to one of Brady's competitors, such as Holt Paper, it would provide Tinder and the competitor with an unfair competitive advantage.

35.     If Tinder were allowed to compete with Bardy in violation of the Agreement, including through direct employment with a competitor, such as Holt Paper, it would put Tinder and the competitor in the position of being able to unfairly compete with Brady.

36.     If Tinder were allowed to compete with Brady in violation of the Agreement, including through solicitation of Brady's customers and clients, including for the benefit of a competitor, such as Holt Paper, it would put Tinder and the competitor in the position of being able to unfairly compete with Brady.

37.     If Tinder were allowed to compete with Brady in violation of the Agreement, including through use of Brady's confidential and trade secret information, including for the benefit of a competitor, such as Holt Paper, it would put Tinder and the competitor in the position of being able to unfairly compete with Brady.

**Tinder Resigns His Employment and Violates the Restrictive Covenants in the Agreement and Applicable Law; Holt Paper Violates Applicable Law**

38.     Tinder voluntarily resigned his employment with Brady effective on or about December 20, 2024.

39.     Upon information and belief, Tinder became employed Holt Paper within approximately two weeks of his resignation from Brady.

40.     Holt Paper is a direct competitor of Brady.

41.     Holt Paper sells food, paper, janitorial, and foodservice products.  Holt Paper services restaurants, businesses, manufacturers, schools, casinos, healthcare facilities, chain businesses, and governmental organizations.  Holt Paper is based in Maryland, and its geographic reach is as far north as Pennsylvania, as far south as North Carolina, and everything in between.

42.     Upon information and belief, Tinder is employed by Holt Paper in a sales position at its location in Baltimore, Maryland.

43.    Beginning in January 2025 and continuing to date, Brady employees have personally witnessed Tinder soliciting or attempting to solicit Brady's clients, customers, and prospects—including specifically clients, customers, and prospects that Tinder formerly worked with while employed by Brady.

44.    Beginning in January 2025 and continuing to date, Brady has been advised by multiple of its clients and customers that Tinder is soliciting or attempting to solicit their business—including clients and customers that Tinder formerly worked with while employed by Brady.

45.    Upon information and belief, and by presumption and inevitability per the Agreement, Tinder is currently using and will continue to use Brady's confidential information and trades secrets in his employment with Holt Paper and in soliciting Brady's clients, customers, and prospects.

46.    Upon information and belief, from January to date, Tinder has successfully solicited the following Brady clients and customers—all of which were accounts Tinder managed while employed by Brady:

      a.    Asland Cafe in Cockeysville, Maryland.

      b.    Beiler's Bar-B-Que in Joppatowne, Maryland.

      c.    Bel Air Pizzeria in Bel Air, Maryland.

      d.    Brookside's Pizzeria in Owings Mill, Maryland.

      e.    Carini's in Pasadena, Maryland.

      f.    Cheezy's Pizza in Towson, Maryland.

      g.    Fast Eddie's in Camp Springs, Maryland.

      h.    Michaelangelo's in Towson, Maryland.

      i.      Grape & Grain Wine & Spirits in Nottingham, Maryland.

      j.      Squires Restaurant in Dundalk, Maryland.

      k.      Three Sisters in Baltimore, Maryland.

      l.      Zorba's Pizza & Grill in Edgewood, Maryland.

      m.      Dutch Harbor Seafood in Cockeysville, Maryland.

      n.      Fiesta Grill in Bel Air, Maryland.

      o.      Legend's Pizza in Baltimore, Maryland.

      p.      Lombardi's Pizza in Towson, Maryland.

47.    Upon information, belief, and preliminary calculation, Tinder's solicitation of Brady's clients and customers has caused Brady to lose more than $27,000 in revenue for the month of January 2025 alone.

48.    Upon information and belief, Tinder's solicitation of Brady's clients and customers is continuing to cause Brady to lose revenue to date and Brady expects to lose more than $350,000 in 2025 and comparable, but yet unknown and incalculable amounts, in each year going forward.

49.    Tinder's employment with Holt Paper is violation of the non-competition covenants contained in the Agreement, including but not limited to Section 2(a).

50.    Tinder's solicitation of Brady's clients, customers, and prospects is in violation of the customer non-solicitation covenants contained in the Agreement, including but not limited to Section 2(b).

51.    Tinder's employment with Holt Paper and solicitation as described above is violation of the confidentiality and non-disclosure covenants contained in the Agreement, including but not limited to Section 2(d).

52.    Brady did not authorize Tinder to violate the terms of the Agreement.

53.    Brady specifically did not authorize Tinder to use or disclose any of it's confidential, proprietary, and trade secret information after his employment with Brady.  Nor did Brady authorize Tinder to disclose any of it's confidential, proprietary, and/or trade secret information to Holt Paper or to use such information as part of his employment with or solicitation of clients and customers on behalf of or for the benefit of Holt Paper.

54.    On February 3, 2025, Brady sent Tinder a letter advising him of his ongoing non-competition, non-solicitation, and other obligations contained in the Agreement and demanding that he cease and desist from any further breaches of his obligations and restrictions set forth in that Agreement. A true and correct copy of that letter is attached as **Exhibit B**.   The letter also informed Tinder that Brady would not hesitate to enforce the Agreement if he failed and/or refused to comply with his contractual obligations.

55.    On February 3, 2025, Brady sent Holt Paper and its legal counsel two letters putting it on notice that Tinder is subject to a non-competition, non-solicitation, and confidentiality agreement and that Tinder has continuing obligations, duties and restrictions owed to Brady under the Agreement and federal and state law—and demanding that Holt Paper cease any interference therewith. True and correct copies of the letters that Brady sent to Holt Paper and its counsel are attached as **Exhibit C** and **Exhibit D**.  The letters also informed Holt Paper that Brady would not hesitate to enforce its contractual or to hold Holt Paper accountable for its violations of law if it failed and/or refused to comply therewith or interfered with Brady's contractual rights.

56.    Despite Brady's requests, Tinder and Holt Paper have not substantively responded and have taken no corrective action and continue to violate or seek to violate the applicable law and the Agreement.

## COUNT I
## BREACH OF CONTRACT
### (Against Tinder)

57.     Brady incorporates by reference all of the previous allegations as though fully set forth herein.

58.     Through the Agreement, Brady and Tinder formed and entered into an enforceable, valid, and legally binding contract.

59.     The Agreement is supported by adequate consideration.

60.     Brady performed all duties and conditions precedent under the Agreement.

61.     Tinder owes continuing duties to Brady under the Agreement, including non-competition, non-solicitation, and confidentiality and non-disclosure restrictions.

62.     The Agreement's restrictive covenants are reasonable and enforceable, including as to time and scope, and are necessary to protect Brady's legitimate business interests, including but not limited to its goodwill, confidential, proprietary, or trade secret or technical information, and relationships with current or prospective clients and customers.

63.     Tinder, by and through the actions described above, including but not limited to, taking and intending to maintain employment with Holt Paper, soliciting Brady clients and customers, and inevitably using and disclosing Brady's confidential, proprietary and trade secret information, has breached and will continue to breach his contractual obligations owing to Brady.

64.     Brady has suffered and will continue to suffer irreparable harm because of Tinder's actions and, as a result, is entitled to preliminary and permanent injunctive relief enforcing the terms of the Agreement.

65.    Brady has no adequate remedy at law to protect its substantial business interests and rights at issue in this lawsuit. The damages from Tinder's failure to comply with the Agreement are considerable and continuing and thus not capable of specific ascertainment at this time.

66.    Brady has been damaged, and will continue to be damaged, by Tinder's breaches of the Agreement in an amount to be proven at trial, plus costs, disbursements, interest, and attorneys' fees.

### COUNT II
### VIOLATION OF FEDERAL DEFEND TRADE SECRETS ACT 18 U.S.C. §§ 1836, *et seq*.
### (Against All Defendants)

67.    Brady incorporates by reference all of the previous allegations as though fully set forth herein.

68.    The Federal Defend Trade Secrets Act protects the trade secrets and confidential information of Brady.

69.    Brady has invested significant time, money, and other resources in developing its confidential, proprietary, and trade secret information, as previously described herein.

70.    The trade secrets and confidential information referenced in the Agreement and described herein are protected by the Defend Trade Secrets Act.  These trade secrets derive independent economic value from not being generally known to, and readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

71.    Brady has taken efforts that are reasonable to maintain the secrecy of its trade secret information.

72.    Upon information and belief, Tinder has taken and continues to have access to Brady's confidential information and trades secrets.  Tinder misappropriated these trade secrets by taking them through improper means and by obtaining them in breach of the confidence reposed

in him by Brady.  Tinder has already and continues to unlawfully use Brady's confidential information and trade secrets to unfairly compete with Brady on behalf of and for the benefit of Holt Paper.

73.     Upon information and belief, Tinder's actions have been taken at the direction of, in coordination with, and for the benefit of Holt Paper.

74.     Upon information and belief, Tinder has disclosed, or is imminently likely to disclose, Brady's confidential information and trade secrets to Holt Paper.

75.     Holt Paper knows or has reason to know that Brady's confidential information and trade secrets provided to it by Tinder were acquired by improper means and Holt Paper nevertheless continues to use, disclose, and/or benefit from such information.

76.     Upon information and belief, Tinder's solicitation of Brady's clients and customers, and his employment with Holt Paper, necessarily and inevitably involves the continued misuse and misappropriation of Brady's confidential information and trade secrets to unfairly compete with Brady.

77.     The misappropriation of trade secrets and other misconduct alleged herein occurred in interstate commerce.

78.     Defendants have, upon information and belief, acted in a willful and malicious manner in misappropriating the trade secrets of Brady and therefore should be required to pay exemplary damages to Brady in an amount to be determined at trial pursuant to 18 U.S.C. § 1836(b)(3)(C).

79.     Defendants have, upon information and belief, acted in a willful and malicious manner in misappropriating the trade secrets of Brady and therefore should be required to pay

Brady's attorneys' fees in an amount to be determined at trial pursuant to 18 U.S.C. § 1836(b)(3)(D).

80.     Brady has suffered and will continue to suffer irreparable harm as a result of Defendants' misappropriation and, as a result, is entitled to preliminary and permanent injunctive relief to protect its confidential and trade secret information and to prevent future misappropriation.

81.     Brady has no adequate remedy at law to protect its confidential and trade secret information. The damages from Defendants' actions are considerable and continuing and thus not capable of specific ascertainment at this time.

82.     Brady has been damaged, and will continue to be damaged, by Defendant's misappropriation in an amount to be proven at trial, plus costs, disbursements, interest, and attorneys' fees.

## COUNT III
## VIOLATION OF MARYLAND UNIFORM TRADE SECRETS ACT ("MUSTA"), Md. Cts. & Jud. Code §§ 11-1201, *et seq.*
## (Against All Defendants)

83.     Brady incorporates by reference all of the previous allegations as though fully set forth herein.

84.     The MUSTA protects the trade secrets and confidential information of Brady.

85.     Brady has invested significant time, money, and other resources in developing its confidential, proprietary, and trade secret information, as previously described herein.

86.     The trade secrets and confidential information referenced in the Agreement and described herein are protected by the MUSTA.  These trade secrets derive independent economic value from not being generally known to, and readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

16

87.    Brady has taken efforts that are reasonable to maintain the secrecy of its trade secret information.

88.    Upon information and belief, Tinder has taken and continues to have access to Brady's confidential information and trades secrets.  Tinder misappropriated these trade secrets by taking them through improper means and by obtaining them in breach of the confidence reposed in him by Brady.  Tinder has already and continues to unlawfully use Brady's confidential information and trade secrets to unfairly compete with Brady on behalf of and for the benefit of Holt Paper.

89.    Upon information and belief, Tinder's actions have been taken at the direction of, in coordination with, and for the benefit of Holt Paper.

90.    Upon information and belief, Tinder has disclosed, or is imminently likely to disclose, Brady's confidential information and trade secrets to Holt Paper.

91.    Holt Paper knows or has reason to know that Brady's confidential information and trade secrets provided to it by Tinder were acquired by improper means and Holt Paper nevertheless continues to use, disclose, and/or benefit from such information.

92.    Upon information and belief, Tinder's solicitation of Brady's clients and customers, and his employment with Holt Paper, necessarily and inevitably involves the continued misuse and misappropriation of Brady's confidential information and trade secrets to unfairly compete with Brady.

93.    Defendants have, upon information and belief, acted in a willful and malicious manner in misappropriating the trade secrets of Brady and therefore should be required to pay exemplary damages to Brady in an amount to be determined at trial pursuant to Section 11-1203 of MUTSA, Md. Com. L. Code II., § 11-1203.

94.     Defendants have, upon information and belief, acted in a willful and malicious manner in misappropriating the trade secrets of Brady and therefore should be required to pay Brady's attorneys' fees in an amount to be determined at trial pursuant to Section 11-1204 of MUTSA, Md. Com. L. Code II., § 11-1204.

95.     Brady has suffered and will continue to suffer irreparable harm as a result of Defendants' misappropriation and, as a result, is entitled to preliminary and permanent injunctive relief to protect its confidential and trade secret information and to prevent future misappropriation, including pursuant to Sections 11-1202 and 11-1205 of MUTSA, Md. Com. L. Code II., §§ 11-1202 and 11-1205.

96.     Brady has no adequate remedy at law to protect its confidential and trade secret information. The damages from Defendants' actions are considerable and continuing and thus not capable of specific ascertainment at this time.

97.     Brady has been damaged, and will continue to be damaged, by Defendant's misappropriation in an amount to be proven at trial, plus costs, disbursements, interest, and attorneys' fees.

<u>**COUNT IV**</u>
<u>**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**</u>
<u>**(All Defendants)**</u>

98.     Brady incorporates by reference all of the previous allegations as though fully set forth herein.

99.     Brady has established numerous relationships, contractually and otherwise, with clients, customers, and other prospective or potential buyers or users of its products and services. Brady reasonably expects such relationships to continue in the future and for those relationships to result in economic advantage or benefit to Brady as it conducts its lawful business.

100.    Defendants knew about Brady's reasonable expectation of prospective economic advantage or benefit from these clients, customers, and prospects.

101.    Defendants are intentionally and willfully interfering with Brady's reasonable expectation of prospective economic advantage, without legal justification, and intend to continue to do so in the future.

102.    Defendants' intentional interference with Brady's reasonable expectation of prospective economic advantage has been and is being done in a manner calculated to cause damage to Brady and its lawful business.

103.    Defendants' intentional interference with Brady's reasonable expectation of prospective economic advantage has been and is being done with the unlawful purpose to cause such damage and loss and without right or justifiable cause (i.e. with malice).

104.    Defendants' actions have caused actual damage and loss to Brady.

105.    As a result of Defendants' wrongful interference, Brady has suffered and is continuing to suffer irreparable harm and, as a result, is entitled to preliminary and permanent injunctive relief.

106.    As a direct and proximate result of Defendants' wrongful interference, Brady has suffered and is continuing to suffer irreparable injury and has incurred and is continuing to incur monetary damages in an amount to be proven at trial, plus costs, disbursements, interest, and attorneys' fees.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Holt Paper)**

107.    Brady incorporates by reference all of the previous allegations as though fully set forth herein.

108.    The Agreement between Brady and Tinder is an enforceable, valid, and legally binding contract.

109.    Holt Paper had and continues to have knowledge of the existence and specific terms of the Agreement between Brady and Tinder, including without limitation Tinder's ongoing restrictive covenant obligations owed to Brady.

110.    Upon information and belief, Holt Paper, including by its above-described actions, has and continues to intentionally interfere with the Agreement between Brady and Tinder.

111.     Tinder has breached the Agreement as described above, including with Holt Paper's knowledge, inducement, encouragement, and direction.

112.     Holt Paper acted with actual malice toward Brady and with specific intent of injuring Brady's business.

113.    Brady has suffered actual damage and loss as a result of Tinder and Holt Paper's actions.

114.    As a result of Holt Paper's wrongful interference, Brady has suffered and is continuing to suffer irreparable harm and, as a result, is entitled to preliminary and permanent injunctive relief.

115.    As a direct and proximate cause of Holt Paper's tortious interference with Brady's contractual rights, Brady has been damaged in an amount to be proven at trial, plus costs, disbursements, interest, and attorneys' fees.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff Brady requests that the Court grant the following relief:

A.    Entering judgment in Brady's favor on all claims herein against Defendants and awarding an amount sufficient to compensate Brady for it damages, together with interest, costs,

and fees, as allowed by law or contract, and any such other relief as the Court deems just and equitable.

      B.      For an order for a preliminary and permanent injunction directing Tinder, and all others in active concert or participation with him, including Holt Paper, to immediately cease violating the Agreement, including but not limited to immediate termination of Tinder's employment at Holt Paper.

      C.      For an order for a preliminary and permanent injunction directing all Defendants, and all others in active concert or participation with them, to immediately cease any and all use and/or disclosure of the confidential, proprietary, and trade secret business information of Brady pursuant to the Defend Trade Secrets Act and the MUSTA.

      D.      For an order for preliminary and permanent injunction directing all Defendants, and all others acting in concert or participation with them, to immediately cease tortiously interfering with Brady's prospective economic advantage.

      E.      For an order for preliminary and permanent injunction directing Holt Paper, and all others acting in concert or participation with them, to immediately cease tortiously interfering with Brady's contractual relations.

      F.      For an order requiring Defendants to return to Brady all trade secret, confidential, or proprietary information, of any nature, owned by Brady.

      G.      For an award against Defendants, jointly and severally, for the damages Brady has sustained, including actual, compensatory, consequential, and exemplary damages; other damages to Brady's business; all damages available under the Defendant Trade Secrets Act and the MUSTA, the profits Defendants have derived as a result of Defendants' aforementioned conduct, and

disgorgement by Defendants of all amounts unjustly received by them, all in an amount to be proven at trial.

H.    For an award against Defendants, jointly and severally, for Brady's attorneys' fees, costs, and expenses incurred in this action.

I.    For such other relief as the Court deems just and equitable.

Dated: April 30, 2025                              **LATHROP GPM LLP**

By  /s/ _____
     Maisa J. Frank (USDC MD No. 31485)
     Lathrop GPM LLP
     The Watergate – Suite 700
     600 New Hampshire Avenue, N.W.
     Washington, D.C. 20037
     Telephone: (202) 295-2200
     Facsimile: (202) 295-2250
     maisa.frank@lathropgpm.com

     Caitlin R. Gehlen (MN #0398472)
     (*Pro hac vice* Forthcoming)
     Michael R. Link (MN #0390019)
     (*Pro hac vice* Forthcoming)
     3100 IDS Center
     80 South Eighth Street
     Minneapolis, Minnesota 55402
     Telephone: (612) 632-3000
     caitlin.gehlen@lathropgpm.com
     michael.link@lathropgpm.com

     **ATTORNEYS FOR PLAINTIFF**